UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

**JASON SINGLETON**,

                    Plaintiff,

        -against-

**THE CITY OF GENEVA** and
**DETECTIVE STEVEN VINE,**

                    Defendants.

Case No.: 23-cv-6359

# MEMORANDUM OF LAW IN SUPPORT OF
# MOTION TO AMEND THE COMPLAINT

Rickner Moskovitz LLP
14 Wall Street, Suite 4C
New York, New York 10005

On the Brief:

    Sara Wolkensdorfer, Esq.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...........................................................................................1

FACTUAL AND PROCEDURAL HISTORY ....................................................................3

    a.   Procedural History ............................................................................................3

    b.   The December 8, 2016 Shooting and Investigation ...........................................5

    c.   The Illegal Stop and Arrest of Plaintiff Jason Singleton ...................................9

    d.   Defendant Vine's Fabrications and Omissions to the Singleton Prosecution.................11

    e.   The Grand Jury Proceedings and Singleton's Indictment...............................14

    f.   The Prosecution Denies Knowledge of Any Brady Material .........................15

    g.   Defendant Vine Continues to Provide False and Inconsistent Testimony.....................16

    h.   Johnson's Arrest and Trial .............................................................................19

    i.   Singleton's Conviction is Reversed ................................................................19

STANDARD ....................................................................................................................20

ARGUMENT ...................................................................................................................20

    I.   **Plaintiff has good cause to amend the pleadings**...........................................20

    II.   **Plaintiff's additional claims against Defendant Vine are meritorious**........................21

    III.   **Amendment will not prejudice the Defendants**.............................................24

CONCLUSION ................................................................................................................25

## TABLE OF AUTHORITIES

**CASES**

*Bermudez v. City of New York*, 790 F.3d 368 (2d Cir. 2015) ..........................................................22

*Block v. First Blood Assocs.*, 988 F.2d 344 (2d Cir. 1993) ............................................................25

*Brady v. Maryland*, 373 U.S. 83 (1963) .....................................................................................15, 16

*Brown v. City of New York*, 13-CV-6912 (TPG), 2015 U.S. Dist. LEXIS 154201 (S.D.N.Y. Nov. 13, 2015) ...........................................................................................................................................21

*Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44 (2d Cir. 1983) .....................................................24

*Foman v. Davis*, 371 U.S. 178 (1962) ....................................................................................20, 24

*Giglio v. United States*, 405 U.S. 150 (1972) .................................................................................22

*Hill v. Griffin*, 10-CV-06419 (EAW), 2018 WL 5078255, at *1 (W.D.N.Y. Oct. 18, 2018).........20

*Hillburn by Hillburn v. Maher*, 795 F.2d 252 (2d Cir. 1986)........................................................20

*Horn v. Adger*, 24-1034, 2025 WL 1618761, at *2 (2d Cir. June 9, 2025)....................................23

*Manganiello v. City of New York*, 612 F.3d 149 (2d Cir. 2010)......................................................23

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184 (2d Cir. 2007) .............................................20

*Napue v. Illinois*, 360 U.S. 264 (1959) ..........................................................................................22

*Oxaal v. Internet Pictures Corp.*, 00-CV-1863 (LEK/DRH), 2002 WL 485704, at *1-2 (N.D.N.Y. Mar. 27, 2002)..................................................................................................................................20

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997)........................................................23

*Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119 (2d Cir. 1991)........................................................20

*Robinson v. Colonie*, 91-CV-1355, 1993 WL 191166, at *3 (N.D.N.Y. June 3, 1993) .................21

*Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129 (2d Cir. 1993) ........................................................24

*State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843 (2d Cir. 1981)............................................25

ii

*Strickler v. Greene*, 527 U.S. 263 (1999) ........................................................................22

*United States v. Rivas*, 377 F.3d 195 (2d Cir. 2004) ........................................................22

*Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992).............................................22, 23

**RULES**

Fed. R. Civ. P. 15 ..........................................................................................................21, 25

Plaintiff Jason Singleton hereby submits this Memorandum of Law in Support of his Motion to Amend the Complaint to add and supplement his claims in the instant action.

## PRELIMINARY STATEMENT

Jason Singleton was wrongfully convicted and imprisoned for nearly four years due to the intentional and malicious conduct of Defendant Steven Vine, who provided fabricated evidence to the prosecution, lied repeatedly in sworn testimony, and failed to disclose multiple pieces of exculpatory evidence to the prosecution. On February 8, 2017, the date of Mr. Singleton's arrest, there was an active and desperate search to find Joshua "Jay-O" Johnson, who was wanted for a shooting and armed robbery that left one victim paralyzed. Defendant Vine claimed that on that day, he received information from a confidential informant ("CI") that a black man from Rochester with a warrant and the street name "Jay" was staying at a local hotel. Vine believed the individual could be Joshua Johnson. Defendant Vine had no reason to believe this information was reliable, however. Two witnesses were shown a photograph of Johnson and failed to positively identify him as the black man at the hotel. Additionally, Vine's CI was a self-admitted drug user who had not provided documented information to the Geneva Police Department's Drug Enforcement Unit ("DEU") since 2004—at least seven years before Vine even joined the DEU.

Despite the obvious lack of reliability of the CI's information, Defendant Vine performed an unlawful stop of the taxi carrying the black man who was staying at the hotel. That man was Plaintiff Jason Singleton, who had no connection to Joshua Johnson or the armed robbery for which he was wanted. During the stop of the taxi Mr. Johnson was riding in, Defendant Vine claimed he found a bag of crack cocaine in plain sight on the passenger side floor. No other officer on scene corroborated Vine's account. Worse yet, we now know that in the hours before Mr. Singleton's arrest, Vine was carrying out undercover buys of crack cocaine. A more than reasonable inference

1

is that *if* crack cocaine was found in the taxi, it was planted there by Defendant Vine when Mr. Singleton was unable to provide information on the whereabouts of Johnson.[1]

To support the charges against Mr. Singleton, Defendant Vine lied. He made knowingly and intentionally false statements in his police reports, claiming, among other things, that at the time of Mr. Singleton's arrest, he did not know what Johnson looked like—and provided this false information to prosecution. Defendant Vine compounded this malfeasance by failing to disclose exculpatory and impeachment evidence to prosecutors, including records that undermine the veracity of the alleged CI; proof that he failed multiple times to get a positive ID any black man at the hotel; and hundreds of pages of records demonstrating his knowledge of Johnson's physical appearance at the time of Mr. Singleton's arrest.

This information, had it been produced, would have dramatically undercut the veracity of Vine's police reports and his testimony in the grand jury, in the pretrial evidentiary hearing, and at Mr. Singleton's trial. It also would have established that Vine provided knowingly fabricated evidence to the prosecution. There is a strong probability that if Vine had not provided the Singleton prosecution with false information, and had properly disclosed the relevant evidence, Mr. Singleton would not have spent almost four years in prison. Mr. Singleton's conviction was ultimately overturned in March 2022 when the Appellate Division held that Vine lacked reasonable suspicion to initiate the traffic stop.

Evidence of Defendant Vine's egregious conduct was only recently produced in discovery in this action. Based on this evidence, Plaintiff respectfully requests leave to amend his Complaint

---

[1] In the alternative, the crack cocaine belonged to the taxi driver, Eric Passalacqua ("Passalacqua"), the cousin of then-Chief of Police, Michael Passalacqua. Passalacqua is currently serving a twenty-year sentence in the Federal Bureau of Prisons and as part of his sentencing, provided a written statement where he admitted to using alcohol and cocaine "for the better part of 15 years."

2

to supplement the facts supporting his current claims and to add two claims against Defendant Vine for his *Brady/Giglio* violations and fabrication of evidence.[2] Plaintiff has good cause to amend, his supplemental claims are meritorious, and the proposed amendments will not prejudice Defendants. Accordingly, Plaintiff respectfully submits that this motion should be granted.

## FACTUAL AND PROCEDURAL HISTORY

### a. Procedural History

On January 24, 2018, Mr. Singleton was wrongfully convicted after a jury trial of criminal possession of a controlled substance in the third degree. On May 18, 2018, Plaintiff was sentenced to seven (7) years in prison plus three (3) years post release supervision. After spending almost four years in prison, on March 18, 2022, the Supreme Court of the State of New York, Appellate Division, Fourth Department reversed the judgment of conviction, dismissed the indictment, and remitted the case to Ontario County Court. Ten days later, Ontario County Court dismissed all criminal charges against Mr. Singleton and terminated the proceeding in his favor. *See People v. Singleton*, 203 A.D.3d 1646 (4th Dep't 2022).

In June 2023, Mr. Singleton brought the instant action for injuries he sustained as a result of his wrongful prosecution and imprisonment against the City of Geneva and Detective Steven Vine ("Defendant Vine" or "Vine"). *See* ECF Doc. 1. Specifically, Mr. Singleton alleged causes of action under 42 U.S.C. § 1983 against Vine for prosecution without probable cause and due process violations; § 1983 *Monell* claims against the City of Geneva; state law claims for intentional and/or negligent affliction of emotional distress and malicious prosecution against Vine and the City of Geneva; state law negligent hiring, screening, retention, supervision, and training

---

[2] Plaintiff also voluntarily withdraws his *Monell* claim against Defendant the City of Geneva.

against the City of Geneva; and claims for violations of Article I, § 12 of the New York Constitution against the City of Geneva.

In discovery, the parties requested and received records from several third parties, including the Ontario County Sheriff's Office ("OCSO"), which was involved in Mr. Singleton's arrest, and the Ontario County District Attorney's Office ("OCDA"), which prosecuted Mr. Singleton. It was not until July 2025, while deposing non-party OCSO officer Matthew Asquino, that the parties learned OCSO had failed to produce all relevant documents. Mr. Asquino testified about radio logs from the date of Mr. Singleton's arrest that he reviewed in preparation for his deposition—radio logs which the parties had no idea existed.

As a result, both parties subpoenaed OCSO and OCDA and received supplemental disclosures in August and October 2025. However, as noted in Plaintiff's requests to the Court for discovery extensions, the parties had still not received OCDA's file on Joshua "Jay-O" Johnson ("Johnson"), who OSCO and Defendant Vine were investigating for the December 8, 2016 armed robbery when they stopped Mr. Singleton's taxi in February 2017. It was not until January 30, 2026, after months of correspondence with Nathan Thomas, an Assistant County Attorney at OCDA, that the parties finally received the Johnson file. The Johnson file included approximately 7,900 pages of records, and hours of video footage.

Around this same time, Plaintiff received belated discovery productions from Defendants on November 11, 2025 and January 13, 2026. Yet, key documents remained missing, which required Plaintiff to serve a follow-up request on February 23, 2026. Defendants did not respond until March 26, 2026, the day after Plaintiff threatened to file a motion to compel. Defendants' recently produced discovery revealed the multiple pieces of *Brady/Giglio* material that Defendant

4

Vine had withheld from prosecutors, which forms the core of Plaintiff's proposed amendments described below.

Additionally, two key depositions did not occur until the last few weeks of discovery. Those depositions were of Michael Tantillo, the Ontario County assistant district attorney who prosecuted Mr. Singleton's case, and an additional deposition of Defendant Vine, who needed to be questioned about the *Brady/Giglio* material that had just been produced.[3]

Based on the revelations of this recently produced discovery, Plaintiff now moves to amend his complaint to include additional facts that support his existing claims and to include several new claims against Defendant Vine. The Proposed First Amended Complaint ("Proposed FAC") is attached herein as **Exhibit A** (redline) and **Exhibit B** (clean version).

### b. The December 8, 2016 Shooting and Investigation

After reviewing the entirety of the Johnson file, Plaintiff's counsel learned the true extent of Defendant Vine's withholding of exculpatory and impeachment evidence because of his intimate involvement in the investigation of Joshua Johnson and his knowledge of Johnson's appearance at the time of Mr. Singleton's arrest. The Johnson file revealed the following evidence.

On December 8, 2016, shortly after 8:00 p.m., Adrian Porter ("Porter") sustained a gunshot wound to his abdomen during an armed robbery of his home at 71 Wadsworth Ave, Apartment 2, in Geneva, New York. Porter, his roommate, Reynaldo Dejesus ("Dejesus"), and friend, Jose Escalera ("Escalera"), were in the apartment when two black men in masks came in and ransacked the apartment. At some point during the robbery, one of the masked men shot Porter with a

---

[3] Mr. Tantillo was deposed on March 13, 2026. Defendant Vine was scheduled to be deposed on March 6, 2026, but the day before, defense counsel cancelled the deposition. Plaintiff's counsel followed up multiple times to reschedule Vine's deposition, but it was not until threatening to file a motion to compel on March 25, 2026, that his deposition was rescheduled. Vine was deposed on the last day of discovery, March 31, 2026.

shotgun. Both GPD and OCSO arrived on scene to investigate. Defendant Vine arrived on scene at approximately 8:30 p.m. **Ex. C**.

The OCSO K9 unit were able to track the suspects from 71 Wadsworth Ave to a nearby apartment building, 177 Exchange Street, which was equipped with video surveillance. GPD Officers, including Defendant Vine, watched the video surveillance in the basement of 177 Exchange Street. **Ex. C**. In the videos, two black males and one black female are shown being dropped off at 177 Exchange Street by an Orange Pontiac G5, which was known to Defendant Vine to be driven by Luis Merced ("Merced"). The video clearly showed two black males entering the side door of 177 Exchange Street, one carrying a shotgun and both with numerous bags. **Ex. D**. The two black men are then seen meeting with a black female at the front entrance of the building, and she is seen carrying what appeared to be a shotgun covered in a blanket. **Ex. D**.

Several GPD officers recognized the black female in the video as Khaishia Parker ("Parker"). Defendant Vine recognized the name Parker, as he knew her to be the girlfriend of a black man with the street name "J" and a Facebook name of DaGhost Johnson—whose real name was Joshua Johnson. **Ex. C**. A GPD sergeant also recognized the second black male as Domnique "Dunkin" Wiley, whose real name was Derrick Settles ("Settles"). **Ex. C**. Defendant Vine had been actively targeting Johnson in crack sales from 68 North Genessee Street—where Parker's sister, Daechrisia, lived—and knew from his investigations that Johnson and Settles had recently been dealing crack in Geneva. **Ex. C**.

On the night of the shooting, Vine arrived at the Geneva Police station as GPD officer Brian Choffin ("Choffin") was interviewing Escalera. **Ex. C**. Although Escalera did not know who they were, he positively identified the two black men in the surveillance footage from 177 Exchange Street as the men who had broken into the apartment. **Ex. C**. After this interview,

6

Defendant Vine headed to Strong Memorial Hospital to interview Porter and Dejesus, who were getting treatment for their injuries. **Ex. C**.

The next day, December 9, 2016, Defendant Vine compiled demographic information and photographs of Johnson, Parker, and Settles from the Department of Motor Vehicles database, Web RICI,[4] and Facebook. **Ex. C**. Vine also obtained a copy of Johnson's Kiwi Energy employee photo identification card and what appears to be a previous mugshot. **Ex. E**. Defendant Vine used these photographs to create photo arrays of the three suspects, which were then used to obtain positive identifications from several witnesses. **Ex. F**. The photographs were also used to create a wanted poster for release to the media. **Ex. G**. The wanted poster listed Defendant Vine as one of the three detectives to contact with any information on the whereabouts of the suspects or other information pertinent to the investigation. **Ex. G**.

Defendant Vine also interviewed Merced, the driver of the Orange Pontiac G5, and Khaishia Parker. **Ex. C**. In Parker's interview, which took place on December 12, 2016, Vine showed her screenshots of the surveillance footage from 177 Exchange Street, Johnson's Kiwi Energy ID, and the wanted poster. Defendant Vine told Parker: "You're with Josh [Johnson]. We know you are. […] That's you two walking in the back door before the shooting." **Ex. H**. When Parker refused to talk, Vine continued: "They're both [Johnson and Settles] crack dealers and I['ve] been buying crack from them. That's how I know who they are. […]" **Ex. H**. When Parker denied knowing Johnson, Defendant Vine retorted: "Are you calling me a liar? Are you telling me I don't know who Joshua Johnson is? […] I been buying crack from your sister's apartment. He's [Johnson] been dealing crack and you've been there." **Ex. H**. Throughout the interview, Defendant

---

[4] The Repository of Integrative Criminalistic Imagining, or Web RICI, is a database that contains Erie County arrest and booking information.

Vine repeated, while pointing at photographs of Johnson and Settles, that he had been investigating them and knew were crack dealers from Rochester. **Ex. H**.

After Parker's interview, Defendant Vine assisted with the search of Daechrisia Parker's (Parker's sister) apartment, 68 N. Genessee Street, Apartment 1, and took photographs of the Quick Pick where Johnson, Settles, and Parker went later the night of the shooting. **Ex. I**, **J**. Defendant Vine also took photographs of 71 Wadsworth Avenue, 177 Exchange Street, and the surrounding areas. **Ex. I**, **J**. On February 10, 2017, Defendant Vine retrieved bullet fragments from Strong Memorial Hospital after they had been removed from Porter's body. **Ex. C**.

Vine was also assigned various tasks throughout the investigation, including downloading evidence from a phone; re-interviewing Dejesus; having Dejesus identify the backpack one of the robbers used; obtaining updated photos of Dejesus' injuries; interviewing Francesca Escalera, another potential witness; obtaining surveillance footage from the Sunoco gas station, the Quick Pick near 177 Exchange Street, and the Red Carpet Inn where Parker admitted to staying on occasion; obtaining video from the taxi the suspects used after the robbery; obtaining other surveillance and information from thruway, tolls, and EZ-Pass; and obtaining additional evidence from Strong Memorial Hospital. **Ex. K**.

On February 2, 2017, Defendant Vine testified at Johnson's grand jury hearing. **Ex. T, 52:8-17**. Defendant Vine provided a positive identification of Johnson using one of the Facebook photographs he obtained from his investigation. **Ex. L**. On the photograph, which was marked as an exhibit at the grand jury, Defendant Vine handwrote Johnson's Facebook name "J" DaGhost Johnson right above Johnson's face. **Ex. L**. The grand jury voted to indict Johnson on Assault in the First Degree (two counts), Assault in the Second Degree (two counts), Burglary in the First Degree (four counts) and Robbery in the First Degree (four counts).

Less than a week later, and just one day before Singleton's arrest, a felony warrant was signed by an Ontario County Judge for Johnson's arrest. At this time, Porter remained in critical condition at Strong Memorial Hospital's Intensive Care Unit. As such, Defendant the City of Geneva, in Defendant Vine's words, was "all hands-on deck to stop" Johnson, who had alluded capture for months. **Ex. T, 81:11-16**. It is apparent from the Johnson file that before Singleton's arrest on February 8, 2017, Defendant Vine was intimately involved in the Johnson investigation, was keenly aware of what Johnson looked like, and had multiple photographs of him.

c.  **<u>The Illegal Stop and Arrest of Plaintiff Jason Singleton</u>**

On February 8, 2017, Defendant Vine allegedly received information from a CI that a black man from Rochester with the street name "Jay" was staying in Room 135 at America's Best Value Hotel ("America's Best" or "the hotel"). The CI allegedly informed Defendant Vine that "Jay" was staying at the hotel with Brianna "Sweetpea" Pessante ("Sweetpea") and had a warrant for his arrest. Defendant Vine did not get any additional information regarding the individual's age, height, weight, build, or skin tone. He did not even show the CI a picture of Johnson, the man he was looking for. Instead, Vine recklessly assumed that "Jay" was Joshua Johnson. After relaying this information to OCSO and GPD, both police departments conducted surveillance on the hotel and observed a black man come in and out of one of the rooms. We now know that the black man officers observed was Mr. Singleton, <u>not</u> Johnson.

In February 2017, Singleton was thirty-five (35) years old, 5 feet 5 inches tall, and weighed approximately 150 pounds. In contrast, Johnson was a baby-faced twenty-three (23) year-old, was 5 feet 11 inches tall, and weighed approximately 170 pounds. Defendant Vine knew all of this.

Additionally, Defendants' March 26, 2026 disclosures contained previously undisclosed police radio recordings from February 8, 2017. In one recording, Defendant Vine can be heard saying he sent a photo of Johnson to the officers surveilling the hotel, and the officers confirmed

9

they were unable to positively ID the black man they saw walking in and out of Room 135. **Ex. M**, **Ex. N**. On one of the recordings, when an OCSO officer asks for someone to show Johnson's photo to the motel clerk to try and get a positive ID, Defendant Vine responded, "I just checked. *He couldn't ID the photo that we had*, but he did say that there was a black male staying there." **Ex. M**.

Defendant Vine admitted in his March 31, 2026 deposition that despite having a photo of Johnson, he never sent it to his CI or ascertained the basis of his CI's knowledge—whether she learned it from someone else or observed the man in Room 135 herself—prior to ordering the traffic stop on Singleton's taxi. **Ex. T, 78-81**. The recordings also indicate that OCSO and GPD, including Defendant Vine, had reason to believe there was a second black male staying in Room 135—the officers state there was "supposedly" another man in Room 135 and the officers agreed to let the taxi get out of the immediate area before pulling over "in case he's [the passenger] not the one and the other one we're looking for [is] still in the room." **Ex. N**; *see also* **Ex. O**. This fact made it even less likely that the person soon arrested would be Johnson.

Despite the obvious physical differences between Singleton and Johnson, Defendant Vine's failure to get a positive ID that Johnson was one of the *two* black men staying in Room 135, and the absence of *any* corroborating information identifying *any* man in Room 135 as Johnson, Defendant Vine ordered OCSO and GPD to initiate a warrantless and suspicionless traffic stop of the taxi that Singleton was riding in.

Once stopped, the driver, Eric Passalacqua, immediately exited the vehicle. With his weapon drawn, Defendant Vine approached the passenger side of the vehicle, saw Singleton and knew he was not Johnson. Despite this, Vine ordered Singleton out of the vehicle and demanded his ID. Defendant Vine asked Singleton if there was another man staying with him in Room 135.

10

When Singleton told Defendant Vine he did not know of any other man staying in Room 135, Defendant Vine became incensed and threatened Singleton, stating that if he did not tell him who else was staying in the hotel room, the bag of crack cocaine Vine had would be his—meaning Vine would falsely accuse Singleton of drug possession. When Singleton reiterated that there was no other man in the room, Vine arrested him for possession. Once Singleton was in custody, Vine asked GPD Officer John Van Savage over radio to meet Vine's CI and show her photos of a few black males to see if one of them was Sweetpea's boyfriend, who presumably would have been staying with her in Room 135. **Ex. M**.

   d.  **Defendant Vine's Fabrications and Omissions to the Singleton Prosecution**

To justify his unlawful stop and arrest of Singleton, Defendant Vine falsified information in several reports that he provided to OCDA to support the charges against Singleton. In the Incident Report, dated February 2, 2017, Vine stated, "[a] black male matching the wanted subject was observed getting into a cab operated by The Other Taxi." **Ex. P**. This was not true—the Johnson file proves that Defendant Vine knew exactly what Johnson, *i.e.*, "the wanted subject," looked like and knew that Singleton was not him. Defendant Vine also intentionally withheld from the Singleton prosecution the extent of his involvement in the Johnson investigation—his written reports, the surveillance footage he reviewed, the photos of Johnson he found and reviewed, the video interviews he conducted, the photographs he took, the searches he took place in, and, most significantly, the fact that he positively identified Johnson in his grand jury testimony *five days before* Singleton's arrest. **Ex. T, 52:8-17**. Defendant Vine was the only GPD officer to testify and provide evidence in Johnson and Singleton's cases and, as a result, he had an obligation to disclose this information. Nonetheless, Vine persisted in lying repeatedly to the Singleton prosecution about his familiarity with Johnson.

Defendant Vine also falsely claimed that upon Singleton's exit from the vehicle, he observed a Walmart bag full of crack cocaine in plain view on the passenger side floor. There were approximately twenty (20) officers on scene that day, yet no other officer reported seeing this bag of crack cocaine, nor did any other officer report observing Vine finding the bag of crack cocaine. In fact, the only evidence of a Walmart bag in the taxi was the one found hanging in the backseat as a makeshift trash. If the Walmart bag even existed, it was not preserved as evidence, even though it could have been tested for the fingerprints of its true owner.

In truth, there was no bag of crack cocaine in the car—and if there was, it was either put there by Defendant Vine, or actually belonged to the taxi driver, Eric Passalacqua ("Passalacqua"), the cousin of then-Chief of Police, Michael Passalacqua. Defendant Vine's career in DEU relies on the undercover purchase of illegal drugs, including crack cocaine. Not only did Vine admit repeatedly to buying crack from Johnson and Settles, but he was also involved in an undercover buy hours before Singleton's arrest. *See* **Ex. H**. Vine's failure to document undercover buys, in clear violation of GPD policy, means he very well could have had crack cocaine in his possession, crack that he used in retaliation against Mr. Singleton when he was unable to provide information on Johnson's whereabouts.

In addition, as a likely result of his family connection, Passalacqua was never treated seriously as a suspect. Passalacqua is currently serving a twenty-year sentence in the Federal Bureau of Prisons and as part of his sentencing, provided a written statement where he admitted to using alcohol and cocaine "for the better part of 15 years." **Ex. Q**. This means that Passalacqua was using cocaine at the time the drugs were found in his taxi.

The Chain of Custody report for the crack cocaine and baggies allegedly found by Defendant Vine was also falsified. The report lists GPD officer Nick Bielowicz ("Bielowicz") as

12

the collecting officer and the officer to submit the crack and baggies into temporary evidence storage. **Ex. R**. In truth, Bielowicz never touched the crack and had no part in the chain of custody beyond making evidence tags; Defendant Vine collected the crack cocaine and baggies out of the taxi and put them in property. **Ex. U**. In the system used by GPD at the time, Defendant Vine would have had to remove his name and manually add Bielowicz as the officer to collect the evidence and submit it into temporary storage. **Ex. T, 23:4-25**.

In addition, Defendant Vine failed to produce a plethora of information to OCDA, in violation of his obligations under *Brady* and *Giglio*. Defendant Vine failed to inform the prosecution that the only records kept regarding his "old informant" were two handwritten pages of notes indicating that the last time she took part in an undercover buy was in March 2004, almost thirteen (13) years before Singleton's arrest. **Confidential Ex. V**. Nor did he inform the prosecution that his failure to keep records of his alleged CI were in violation of GPD's policies and procedures, which in 2017 required, *inter alia*, that a CI file include: a signed working agreement; an activity and contact log; narcotics buy reports; "a complete history of the information received by the CI […]"; information that will "enable review and evaluation by the appropriate supervisor of information given by the CI, the CI's conduct, and the continued stability of the person to serve as a CI [… and] *document the reliability of the CI* […]" (emphasis added). **Ex. W**. The assistant district attorney prosecuting Singleton's case, Michael Tantillo, admitted in his deposition in this case that he "would like to see documentation establishing the reliability of an informant." **Ex. Y:55-57.**

Furthermore, in Defendant Vine's first deposition, when asked to describe what he knew of his CI's drug use, he testified that:

> A: [M]y belief was that [the CI] was using or had just used drugs and she would then come and talk to the police department and know whether she

13

was getting in trouble and wanted to get out of trouble or just giving us information, that's when I believed that she would be using again.

. . . .

Q: Okay. So there were other times following 2012 when she had interactions with the police department and you suspected that she may have been using drugs, but you weren't sure.

A: Correct.

**Ex. S, 78:15-25, 79:1-13**. Defendant Vine knew or had reason to believe his CI was using drugs when she would give the police information, yet he withheld this information from the Singleton prosecution and allowed them to believe she was a reliable informant.

Finally, to maintain his lie about not knowing what Johnson looked like prior to Singleton's arrest, Defendant Vine necessarily withheld information regarding his failed attempts to identify any black man in Room 135 at America's Best. Vine did not inform the Singleton prosecution of the police's failures to get a positive ID of any black man in Room 135; that OCSO and GPD officers had reason to believe there was a second black male in the hotel room; that Defendant Vine sent GPD Officer Van Savage photos of black men to show the CI to have her ID one of them as Sweetpea's boyfriend *after* Singleton's arrest, *see* **Ex. O**; and that Defendant Vine had a photograph of Johnson prior to Singleton's arrest. Indeed, the prosecution was *never* provided a copy of the radio recordings from the traffic stop that led to Singleton's arrest, which confirmed the lack of a positive ID of Johnson as one of the black men staying in the hotel.

   e. **The Grand Jury Proceedings and Singleton's Indictment**

Singleton's grand jury proceeding was held on May 4, 2017, where Defendant Vine was a material witness. Accepting Vine's false statements as true, the prosecution called him to testify. Defendant Vine testified that GPD received information that there was a black male that went by the street name of Jay staying at America's Best, Room 135 with his girlfriend, Sweetpea. **Ex. X**.

14

To confirm this information, Vine testified that he called his old CI, who was a family member of Sweetpea, to ask if she knew Sweetpea's boyfriend. **Ex. X:11**. Vine testified that the informant simply reiterated the information Vine had but added that black male staying with Sweetpea was from Rochester and had a warrant. **Ex. X:11**.

Defendant Vine told the prosecution that shortly after receiving this information from the CI, OCSO and GPD began surveillance on America's Best to see if "we could identify this person." Vine states that "[o]ut of Room 135, a black male that matched the description that we were looking for, comes in and out several times." **Ex. X:12**. This same black male then got into the front seat of a taxi before the vehicle was ordered to stop. **Ex. X:12**. Defendant Vine testified that it was after approaching the vehicle, taking Singleton out of the vehicle, and verifying his ID, that he knew Singleton was not Johnson. **Ex. X:12-13**. Defendant Vine's materially false statements and omissions about Singleton fitting the description and the false statement about where the drugs were found and who collected the evidence led directly to Singleton's indictment on May 11, 2017.

### f. The Prosecution Denies Knowledge of Any *Brady* Material

On July 3, 2017, the People served its response to the Court's pretrial order, affirming, *inter alia*, that "[t]he People have and know of the existence of no evidence favorable to or exculpatory of the defendant under *Brady v. Maryland*, 373 U.S. 83 (1963)." **Ex. DD**.

On July 17, 2017, Singleton's defense attorney, Carrie W. Bleakley ("Bleakley") of the Office of the Ontario County Conflict Defender, filed an omnibus motion requesting an Order suppressing certain tangible property and other evidence or a hearing on the issue.[5] **Ex. DD**. The People's Answering Affirmation simply reiterated its response to the Court's pretrial order, stating

---

[5] Additionally, Bleakley's accompanying affirmation made detailed requests for *Brady* material; "…the names and addresses of all witnesses or persons with direct knowledge of the relevant facts herein, together with any relevant statements, to include the notes of any governmental agent" pursuant to *People v. Rosario*, 9 N.Y.2d 286 (1961) and *People v. Minor*, 118 Misc.2d 351 (1983); and, materials pursuant to *Giglio v. U.S.*, 405 U.S. 150 (1972).

15

that "[t]he People have and know of the existence of no evidence favorable to or exculpatory of the defendant under *Brady v. Maryland*, 373 U.S. 83 (1963)." **Ex. DD**. The People did not address Bleakley's request for *Rosario* or *Giglio* materials.

Mr. Tantillo also acknowledged in his deposition in this case that had he known that any of the information provided by Defendant Vine was false, or that the Chain of Custody report was incorrect, he would have disclosed those facts to Singleton's defense attorney. **Ex. Y:20-24**.

g. **Defendant Vine Continues to Provide False and Inconsistent Testimony**

Defendant Vine provided further falsified evidence to perpetuate Singleton's prosecution. On August 23, 2017, Vine testified falsely at the *Mapp* hearing on whether there was probable cause to stop Singleton's taxi. The prosecution continued to believe the false statements provided by Vine and called him to testify, where he gave false testimony to justify the traffic stop and Singleton's eventual arrest.

This time, Detective Vine told the prosecution that his old CI called him to relay the information that Sweetpea was staying at America's Best, Room 135 with a black male from Rochester, with the street name Jay and a warrant. **Ex. Z:6**. To demonstrate the alleged reliability of the CI, Vine told the prosecution that he had worked with the CI during his first four-to-five years in DEU and that their work together led to "fix or six" arrests that "turned into convictions." **Ex. Z:5-6**. However, this information was false: Vine started working for DEU in 2011 and GPD's internal records on the CI indicate that she had not provided information since March 2004. **Ex. S:36-37, Confidential Ex. V**. Additionally, there are no records in the CI's file demonstrating these arrests and convictions, as required by GPD's polices. **Confidential Ex. V**, **Ex. W**.

Defendant Vine also told the prosecution that the information received about Sweetpea and a man named Jay, "was consistent with who I know Sweetpea to be, the locations that she's been at, the location of the shooting, why we were looking for Joshua Johnson; so it all made sense to

16

me that this could possibly be Joshua Johnson's Sweetpea." **Ex. Z:15-16**. There is not one mention of Sweetpea in the entire Johnson criminal file, nor is there any mention of Johnson having a girlfriend other than Parker, who was pregnant with Johnson's child at the time.

When asked about Johnson's physical appearance, Vine testified that:

> All I can remember is that we were looking for a black male. My involvement in the shooting investigation was, I looked at a video and I saw it – so it was hard to tell how heavy or tall somebody is, especially when the shooting happened, it's wintertime, they're wearing coats, had backpacks on, I couldn't give an accurate weight or height if I had to, but – […] I was looking for a black male by the name of Jay. That's who I was looking for.

**Ex. Z:20**. Defendant Vine told the OCSO and GPD officers to stop the taxi after hearing from the surveillance team that a black man had left the motel; Defendant Vine himself was not in a position where he could observe the motel room himself. **Ex. Z:19**. He and the other officers stopped and surrounded the taxi with their weapons drawn despite their failure to prepare a Use of Force Report disclosing that information. **Ex. Z:22-23**. Defendant Vine told the prosecution that when he approached the passenger side of the taxi with his gun drawn, Singleton was immediately ordered out of the vehicle and detained. **Ex. Z:9, 22-23**. When Singleton was outside the vehicle, Vine falsely testified that he saw a Walmart bag that contained micro-Ziploc baggies that appeared to contain crack cocaine on the passenger door sill. **Ex. Z:9**. He then requested a check of Singleton's identity, which revealed a warrant for his arrest. **Ex. Z:10-11**. Defendant Vine then took Singleton into custody and later seized the crack cocaine. **Ex. Z:9-10**.

Defendant Vine also attempted to further distance himself from the Johnson investigation—testifying that he was merely "helping out other detectives" and that the extent of his involvement in the case was watching the video. **Ex. Z:20**. Vine continued to lie on the stand,

testifying that at the time of Singleton's arrest, he did not know Johnson's age, height, weight, or what he looked like:

> Q:  And prior to the stop of the taxicab, had you actually seen a photograph of Joshua Johnson?
>
> A: Yes and no. I had never seen the actual picture of him, other than if it was the video from the night of our shooting."

**Ex. Z:23**. On October 24, 2017, the trial court made a ruling from the bench that the officers, including Defendant Vine, had reasonable suspicion to stop the taxi based on the tip provided by the alleged CI, the CI that Vine had convinced the prosecution was reliable based on multiple other investigations and prosecutions, none of which happened after 2004, if they happened at all.

On January 22, 2018, the jury trial against Singleton commenced, and Defendant Vine again provided false and inconsistent evidence to the prosecution. This time, Vine told the prosecution that he received the information about a black male named Jay from an active CI that he had worked with since 2011. **Ex. AA:220**. Defendant Vine also told the prosecution that he did not look into Johnson's criminal history, which is false, as one of his investigative reports in Johnson indicates that he searched the suspects on Web RICI. **Ex. AA:237**. Additionally, the "wanted poster" includes screenshots of Johnson's Department of Criminal Justice Services "rap" sheet. **Ex. G**.

Most glaringly, Defendant Vine testified that on the day of Singleton's arrest, he *was* aware of Johnson's height, age, build, and skin tone, contrary to his testimony at both the grand jury proceeding and *Mapp* hearing. **Ex. AA:236**. Despite the differences in appearance, Vine effectuated the traffic stop, and after confirming that the passenger was not Johnson, inexplicably ordered Singleton out the vehicle. He also ***admitted*** to threatening Singleton, telling Singleton that

18

if he did not tell Vine who was in the hotel room that he "would place the drugs on him." **Ex. AA:253**.

Defendant Vine found no one else in the hotel room besides Sweetpea; did not take any photographs of the inside of the taxi or where the crack cocaine was located; did not attempt to get any fingerprints from the packages of the cocaine baggies; nor did he seek to do any forensic analysis of the cell phone that was seized from Singleton. **Ex. AA:254**. He further testified that he did not take any photographs of where the drugs were allegedly found in the taxi. **Ex. AA:254**.

Because of Vine's trail of lies and withheld information, Singleton was wrongfully convicted of criminal possession of a controlled substance in the third degree and sentenced to seven (7) years in prison plus three (3) years post release supervision.

### h.  **Johnson's Arrest and Trial**

When Johnson was finally apprehended and tried, Vine testified on behalf of the People. Defendant Vine authenticated the surveillance footage from 177 Exchange Street and made in court identifications of both Defendants. Most importantly, he went through several clips of the video footage with the jury and was asked multiple times to identify Johnson from the clips. This was the same video footage that Vine testified at Singleton's *Mapp* hearing that he could not use to positively identify Johnson or describe his physical features. **Ex. BB**.

### i.  **Singleton's Conviction is Reversed**

On March 18, 2022, the Appellate Division, Fourth Department, reversed the judgment of conviction and dismissed the indictment against Mr. Singleton, ruling that Defendant Vine did not have reasonable suspicion to believe that Mr. Singleton was the shooting suspect, Johnson. **Ex. CC**. The Court went on to state: "The detective conceded that he had never seen a still photo of the suspect, that the video of the shooting that he did view lacked detail, and he was unaware of whether the suspect's actual height, weight, skin tone […]" and that "the informant never identified

19

the man in the motel room as the shooter and the vague description given […] is too generalized to support the reasonable suspicion required for the officers' stop of the taxi." **Ex. CC**. Had Defendant Vine not fabricated and withheld evidence from the Singleton prosecution, Mr. Singleton would not have had to spend almost four of his life in prison.

## STANDARD

Rule 15(a)(2) of the Federal Rules of Procedure provides that leave to amend pleadings "shall be freely given when justice so requires." It is within the sound discretion of a district court to grant leave to amend in the absence of "futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Further, "a motion to amend the pleadings to conform them to the evidence may be made at any time." *Hill v. Griffin*, 10-CV-06419 (EAW), 2018 WL 5078255, at *1 (W.D.N.Y. Oct. 18, 2018) (citing *Hillburn by Hillburn v. Maher*, 795 F.2d 252, 264 (2d Cir. 1986)).

## ARGUMENT

### I.    Plaintiff has good cause to amend the pleadings.

As Plaintiff learned the supplemental facts in the Proposed FAC up until the end of discovery and because his *Brady/Giglio* and fabrication of evidence claims are meritorious, Plaintiff has demonstrated good cause for his proposed amendments. Federal Rule of Civil Procedure 15 provides that "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is rare that such leave should be denied …." *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) (citing *Foman*, 371 U.S. at 182). Good cause can be established when a party does not discover a basis to amend the pleadings or add parties until the scheduling order's deadline to do so has passed. *See Oxaal v. Internet Pictures Corp.*, 00-CV-1863 (LEK/DRH), 2002 WL 485704, at *1-2 (N.D.N.Y. Mar. 27, 2002) (concluding

20

that good cause was established where, subsequent to the scheduling order deadline for amendment of the pleadings, a Federal Circuit decision "established [a] new rule of law," which defendant sought to assert as a defense in his amended answer); *Robinson v. Colonie*, 91-CV-1355, 1993 WL 191166, at \*3 (N.D.N.Y. June 3, 1993) (finding good cause where the plaintiffs did not learn that they had confused the identity of defendants until they observed defendants at deposition, which was conducted subsequent to scheduling order deadline for filing amended pleadings).

Here, there has been no "undue delay, bad faith, or dilatory motive on the part of the plaintiff." *Brown v. City of New York*, No. 13-CV-6912 (TPG), 2015 U.S. Dist. LEXIS 154201, at \*2-3 (S.D.N.Y. Nov. 13, 2015). Nor has there been "repeated failure to cure deficiencies by amendments previously allowed." *Id.* The majority of evidence used in the Proposed FAC was not disclosed until the week before the close of discovery. Additionally, the Johnson file, though produced at the end of January 2026, took weeks to thoroughly review, and Plaintiff asked Defendant Vine and Mr. Tantillo questions about the Johnson file in their respective depositions to confirm what these documents meant. That these depositions took place during the final weeks of discovery and that Defendants provided discovery up until the discovery deadline was in no way due to a lack of diligence by Plaintiff.

## II.   Plaintiff's additional claims against Defendant Vine are meritorious.

The proposed amendments are also not futile and amplify the allegations already made against the Defendants. Plaintiff's additional claims against Defendant Vine under § 1983 for failure to timely disclose material favorable to the defense under *Brady* and *Giglio*, and for providing fabricated evidence to the prosecution, are meritorious. As Plaintiff's rights under the New York State Constitution were also violated by Defendant Vine's federal due process violations, the Defendant City of Geneva also faces amplified liability under *respondeat superior*.

A *Brady* violation has three components: the material evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004). The government's duty to disclose is not limited to "exculpatory" information, it also includes information that could be used to impeach government witnesses, so-called *Giglio* material. *See Giglio v. United States*, 405 U.S. 150, 154 (1972).

It is well established that police officers are required to "turn exculpatory evidence over to the prosecutors," *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992), and that "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Giglio*, 405 U.S. at 154 (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)); *see also United States v. Gaggi*, 811 F.2d 47, 59 (2d Cir. 1987) ("The duty to disclose encompasses not only exculpatory evidence, but also evidence that may be used to impeach a government witness."). As such, police officers can be held liable for *Brady* due process violations under § 1983 if they withhold exculpatory evidence from prosecutors. *Walker*, 974 F.2d at 299; *see also Bermudez v. City of New York*, 790 F.3d 368, 376 (2d Cir. 2015) ("If the prosecutor was not informed about this evidence, then Defendant officers could be found to have been a proximate cause of these asserted due process violations as well.").

Here, the information and materials that Defendant Vine did not disclose to the Singleton prosecution are clearly *Brady* material insofar as they contradict the testimony he provided at the grand jury, in the *Mapp* hearing, and at trial. Defendant Vine withheld from the prosecution, among other things:

- the extent of his involvement in the Johnson investigation, specifically, that he knew Johnson's height, age, weight, and appearance, had seen multiple

22

photographs of him, and even positively identified him in Johnson's grand jury proceeding, all before Singleton's arrest;

- the radio calls between Defendant Vine and other OCSO/GPD officers proving Vine's failure to positively ID Johnson at the hotel; and,

- that Defendant Vine had little to no documentation reflecting his work with the CI, in violation of GPD's internal policies and procedures, and calls into question her reliability.

Defendant Vine was the only GPD officer involved in the investigation and prosecutions of both Singleton and Johnson, and therefore, had a duty to provide *Brady/Giglio* materials to the prosecution. A reasonable civil jury drawing all permissible inferences in Plaintiff's favor could conclude that this undisclosed information would have affected the outcome of the *Mapp* hearing and the criminal jury's assessment of the witnesses' credibility. *See Horn v. Adger*, 24-1034, 2025 WL 1618761, at *2 (2d Cir. June 9, 2025) (holding, *inter alia*, that evidence that a key witness failed "about 18 times" to positively identify the plaintiff as one of the perpetrators of the robbery, was *Brady* material) (citing *Walker*, 974 F.2d at 300).

With respect to Plaintiff's proposed fabrication of evidence claim, "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). This sort of bad faith misconduct can rebut the presumption of probable cause flowing from a grand jury indictment. *See Manganiello v. City of New York*, 612 F.3d 149, 164 (2d Cir. 2010) (permitting an inference of a detective's malice because, "in light of the other evidence as to [the detective's] conduct of the investigation, [the jury would be entitled] to view [the detective's] misrepresentation as indicative of [his] state of mind all along").

23

Here, a rational jury could conclude that Defendant Vine knowingly lied to the prosecution when he falsely claimed that he did not know what Johnson looked like when Mr. Singleton was arrested; that he lied when he told the prosecution he was minimally involved in the Johnson investigation; and that he falsified the chain of custody report for the drugs allegedly found in the taxi near Singleton, typing the name of a fellow GPD officer who emphatically denied that the drugs were ever in his custody. *See* **Ex. U**. Defendant Vine repeatedly provided this false information to the prosecution despite knowing that it was false, in violation of Mr. Singleton's right to a fair trial. Mr. Tantillo, in his deposition, admitted that he relied on the facts provided by Defendant Vine to prosecute Mr. Singleton and had he known any of them were false, he would not have continued with the prosecution. *See* **Ex. Y**.

III.    **Amendment will not prejudice the Defendants.**

"In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Foman*, 371 U.S. at 182. While the court retains discretion to grant or deny leave to amend under Rule 15(a), "[the] outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Id.* at 182; *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 46 (2d Cir. 1983).

Of particular importance in considering a party's motion to amend is whether the non-moving party will be prejudiced by such amendment. According to the Second Circuit, when evaluating prejudice, a court must consider "whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare

24

for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993) (citations omitted). Mere delay, however, unaccompanied by either bad faith or undue prejudice, does not warrant denial of leave to amend. *Block*, 988 F.2d at 350 (citing *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)).

Here, the basic nature of Plaintiff's due process claims against Defendants remains the same, and there is no reason to believe the supplemental facts and two additional claims against Defendant Vine would involve any supplemental discovery, require Defendants to expend additional resources, or delay the case. As Plaintiff has also worked diligently since the end of discovery—approximately three weeks ago—to compile this motion and draft the Proposed FAC, and has demonstrated good faith, there is no prejudice to the defense.

## CONCLUSION

For the reasons stated above, Plaintiffs should be permitted to amend his Complaint.

Dated:    New York, New York
          April 21, 2026

                                        _____
                                        Sara Wolkensdorfer
                                        Rickner Moskovitz LLP
                                        14 Wall Street, Suite 4C
                                        New York, New York 10005
                                        Phone: (212) 300-6506
                                        Fax: (888) 390-5401
                                        *Attorneys for Plaintiff*

25